[893 NYS2d 590]

In the Matter of the Dissolution of 1545 OCEAN AVENUE, LLC.
CROWN ROYAL VENTURES, LLC, Respondent; OCEAN SUF-
FOLK PROPERTIES, LLC, Appellant, and WALTER T. VAN
HOUTEN et al., Respondents.

Second Department, January 26, 2010

**APPEARANCES OF COUNSEL**

*Rivkin Radler, LLP,* Uniondale (*Joseph Buzzell* and *Cheryl Korman* of counsel), for appellant.

*Barry V. Pittman,* Bayshore, for Crown Royal Ventures, LLC, respondent.

**OPINION OF THE COURT**

Austin, J.

On this appeal, we are asked to determine whether the Supreme Court properly granted the petition of Crown Royal Ventures, LLC (hereinafter Crown Royal), to dissolve 1545 Ocean Avenue, LLC (hereinafter 1545 LLC). For the following reasons, we answer in the negative and reverse the order of the Supreme Court.

## I

1545 LLC was formed in November 2006 when its articles of organization were filed with the Department of State. On November 15, 2006 two membership certificates for 50 units each were issued respectively to Crown Royal and the appellant, Ocean Suffolk Properties, LLC (hereinafter Ocean Suffolk).

On the same date that the membership certificates were issued, an operating agreement was executed by Ocean Suffolk and Crown Royal. The operating agreement provided for two managers: Walter T. Van Houten (hereinafter Van Houten), who was a member of Ocean Suffolk, and John J. King, who was a member of Crown Royal. Each member of 1545 LLC contributed 50% of the capital which was used to purchase premises known as 1545 Ocean Avenue in Bohemia (hereinafter the property) on January 5, 2007. 1545 LLC was formed to purchase the property, rehabilitate an existing building, and build a second building for commercial rental (hereinafter buildings A and B, respectively).

It was agreed by Van Houten and King that they would solicit bids from third parties to perform the necessary demolition and construction work to complete the project. Van Houten, who owns his own construction company, Van Houten Construction (hereinafter VHC), was permitted to submit bids for the project, subject to the approval of the managers.

Ocean Suffolk alleges that when there were no bona fide bidders, the managers agreed to allow VHC to perform the work, while Crown Royal maintains that VHC began demolition and reconstruction on building A without King's consent. In rehabilitating the existing building, Van Houten claims that he discovered and remediated various structural flaws with the claimed knowledge and approval of King or another member of Crown Royal.

King wanted architect Gary Bruno to review the blueprints upon which VHC began demolition since it had been started without the necessary building permits. In addition, King claimed that VHC did not have the proper equipment to ef-

ficiently do the excavation and demolition work, causing the billing to be greater than necessary. VHC billed 1545 LLC the sum of $97,322.27 for this work. King claims that he agreed 1545 LLC would pay VHC's invoice on the condition that it would no longer unilaterally do work on the site. Notwithstanding King's demand, VHC continued working on the site. Despite his earlier protests, King did nothing to stop it.

Thereafter, Bruno applied to the Town of Islip for the necessary building permits. The Suffolk County Department of Health required an environmental review whereby a so-called "hot spot" was detected by an environmental engineering firm which proposed to remediate it for $6,500. F&E, the company recommended by Crown Royal to do the remediation work, estimated that the cost for the environmental remediation work would be about $6,675. King claims that Van Houten objected to F&E and had another firm do a separate evaluation without King's approval, while Van Houten asserts that although F&E eventually charged $8,229.63 for its work, payment to F&E by 1545 LLC was made with his approval. Moreover, Van Houten claimed that the separate evaluation was paid for by Ocean Suffolk out of its own account.

Following this incident, King contended that tensions between King and Van Houten escalated. King asserted that things could not continue as they were or else the project would not be finished in an economical or timely manner. King claimed that Van Houten refused to meet on a regular basis; that he proclaimed himself to be a "cowboy"; and that Van Houten stated he would "just get it done." Nevertheless, King acknowledged that the construction work undertaken by VHC was "awesome."

By April 2007, King announced that he wanted to withdraw his investment from 1545 LLC. He proposed to have all vendors so notified telling them that Van Houten was taking over the management of 1545 LLC. As a result, Van Houten viewed King as having resigned as a manager of 1545 LLC.

Ultimately, King sought to have Ocean Suffolk buy out Crown Royal's membership in 1545 LLC or, alternatively, to have Crown Royal buy out Ocean Suffolk. In the interim, King had his attorney send a "stop work" request to Van Houten.

There ensued discussions regarding competing proposals for the buyout of the interest of each member by the other. No satisfactory resolution was realized. Nevertheless, despite disagreement among the members during this difficult period, VHC

continued to work unilaterally on the site so that the project was within weeks of completion when this proceeding was commenced whereby further work by Van Houten was enjoined.

## II

Article 4.1 of the operating agreement provides that "[a]t any time when there is more than one Manager, any one Manager may take any action permitted under the Agreement, unless the approval of more than one of the Managers is expressly required pursuant to the [operating agreement] or the [Limited Liability Company Law]."

Article 4.12 of the operating agreement entitled, "Regular Meetings," does not require meetings of the managers with any particular regularity. Meetings may be called without notice as the managers may "from time to time determine."

■ Article 7.4 of the operating agreement provides, "any matter not specifically covered by a provision of the [operating agreement], including without limitation, dissolution of the Company, shall be governed by the applicable provisions of the Limited Liability Company Law." Accordingly, dissolution of 1545 LLC is governed by Limited Liability Company Law article VII.

## III

This proceeding was commenced by order to show cause and verified petition seeking the dissolution of 1545 LLC and related relief. The sole ground for dissolution cited by Crown Royal is deadlock between the managing members arising from Van Houten's alleged violations of various provisions of article 4 of the operating agreement. There was no allegation of fraud or frustration of the purpose of 1545 LLC on the part of Ocean Suffolk, Van Houten, and VHC.

Answering the petition, Van Houten, on behalf of his company and Ocean Suffolk, denied the allegations in the petition and set forth their claim that they did business in accordance with the operating agreement. Van Houten alleged that the only significant dissension among the members arose from the inability of the parties to agree on a buyout of each other's interest in 1545 LLC. Significantly, Van Houten alleged, without dispute, that the renovation of building A was within three to four weeks of completion when this proceeding was commenced.

Van Houten also contended that, as a result of King's resignation as a managing member, Crown Royal could not reasonably

claim that a deadlock existed. Moreover, there is no evidence that King complied with article 4.8 of the operating agreement by submitting a written resignation. Nevertheless, by May 10, 2007, in anticipation of a buyout of the Crown Royal interest in the venture, the parties were operating as if Van Houten was the sole managing member of 1545 LLC. Indeed, throughout the negotiations for the buyout, the renovation work on building A continued.

## IV

Limited Liability Company Law § 702 provides for judicial dissolution as follows:

> "On application by or for a member, the supreme court in the judicial district in which the office of the limited liability company is located may decree dissolution of a limited liability company *whenever it is not reasonably practicable to carry on the business* in conformity with the articles of organization or operating agreement" (emphasis added).

The Limited Liability Company Law came into being in 1994. Many of its provisions were amended in 1999 (L 1999, ch 420) to track changes in federal tax code treatment of such entities (*see* Peter A. Mahler, *When Limited Liability Companies Seek Judicial Dissolution, Will the Statute Be Up to the Task?*, 74 NY St BJ 8 [June 2002]). Such amendments included changes in how the withdrawal of a member was to be treated (Limited Liability Company Law § 606) and events of dissolution which relate back to the operating agreement (Limited Liability Company Law § 701).

Although various provisions of the Limited Liability Company Law were amended, Limited Liability Company Law § 702 was neither modified nor amended in 1999. In declining to amend Limited Liability Company Law § 702, the Legislature can only have intended the dissolution standard therein provided to remain the sole basis for judicial dissolution of a limited liability company (*see* McKinney's Cons Laws of NY, Book 1, Statutes §§ 74, 153, 191). Phrased differently, since the Legislature, in determining the criteria for dissolution of various business entities in New York, did not cross-reference such grounds from one type of entity to another, it would be inappropriate for this Court to import dissolution grounds from the Business Corporation Law or Partnership Law to the Limited Liability Company Law.

Despite the standard for dissolution enunciated in Limited Liability Company Law § 702, there is no definition of "not reasonably practicable" in the context of the dissolution of a limited liability company. Most New York decisions involving limited liability company dissolution issues have avoided discussion of this standard altogether (*see e.g. Matter of Extreme Wireless*, 299 AD2d 549, 550 [2002]; *Matter of Horning v Horning Constr., LLC*, 12 Misc 3d 402 [2006]; *Matter of Spires v Lighthouse Solutions, LLC*, 4 Misc 3d 428 [2004]).

Such standard, however, is not to be confused with the standard for the judicial dissolution of corporations (*see* Business Corporation Law §§ 1104, 1104-a) or partnerships (*see* Partnership Law § 62; *see Widewaters Herkimer Co., LLC v Aiello*, 28 AD3d 1107, 1108 [2006] [Appellate Division, Fourth Department, held that the defendants did not plead the requisite grounds for dissolution of a limited liability company in pleading the corporate dissolution standard of "oppressive conduct"]; *see also Matter of Horning v Horning Constr., LLC*, 12 Misc 3d at 413 [holding that Limited Liability Company Law § 702 was "more stringent" than corporate or partnership dissolution standards]).

The Business Corporation Law applies to "every domestic corporation and to every foreign corporation which is authorized to do business in this state" and also to "a corporation of any type or kind, formed for profit under any other chapter of the laws of this state *except a chapter of the consolidated laws*" (Business Corporation Law § 103 [a] [emphasis added]). The grounds for judicial dissolution of a corporation are set forth in article 11 of the Business Corporation Law.

Partnership Law § 10 (2) states that "any association formed under any other statute of this state . . . is not a partnership under this chapter." The bases for dissolution of a partnership are clearly enumerated in Partnership Law §§ 62 and 63.

Limited liability companies thus fall within the ambit of neither the Business Corporation Law nor the Partnership Law.

The language of Limited Liability Company Law § 702 appears to be borrowed from Revised Limited Partnership Act (Partnership Law) § 121-802 (dissolution is authorized when it is "not reasonably practicable to carry on the business in conformity with the partnership agreement") and Partnership Law § 63 (1) (d), in which dissolution is permitted, inter alia, where a partner's conduct of the partnership business makes it "not reasonably practicable to carry on the business in partner-

ship with him." While there are no New York cases which interpret and apply this standard in the context of limited partnerships, it has been held to mean that, without more, disagreements between the partners with regard to the accounting of the entity are insufficient to warrant dissolution (*see Red Sail Easter Ltd. Partners, L.P. v Radio City Music Hall Prods., Inc.*, 1992 WL 251380, \*5-6, 1992 Del Ch LEXIS 203, \*12-17 [1992]).

The Limited Liability Company Law also clarifies its scope by defining "limited liability company" as "an unincorporated organization of one or more persons having limited liability . . . other than a partnership or trust" (Limited Liability Company Law § 102 [m]). Thus, the existence and character of these various entities are statutorily dissimilar as are the laws relating to their dissolution (*compare* Business Corporation Law art 11; Partnership Law §§ 62, 63; Limited Liability Company Law § 702). Indeed, it was found to be improper to apply partnership dissolution standards to a cause for dissolution of a limited liability company (*see Matter of Spires v Lighthouse Solutions, LLC*, 4 Misc 3d at 431).

■ In the absence of applying Business Corporation Law or Partnership Law dissolution factors to the analysis of what is "not reasonably practicable," the standard for dissolution under Limited Liability Company Law § 702 remains unresolved in New York. However, Limited Liability Company Law § 702 is clear that unlike the judicial dissolution standards in the Business Corporation Law and the Partnership Law, the court must first examine the limited liability company's operating agreement (*see Matter of Spires v Lighthouse Solutions, LLC*, 4 Misc 3d at 432) to determine, in light of the circumstances presented, whether it is or is not "reasonably practicable" for the limited liability company to continue to carry on its business in conformity with the operating agreement (*id.* at 433). Thus, the dissolution of a limited liability company under Limited Liability Company Law § 702 is initially a contract-based analysis.

Section 102 (u) of the Limited Liability Company Law defines "operating agreement" as "any written agreement of the members concerning the business of a limited liability company and the conduct of its affairs." Limited Liability Company Law § 417 (a) mandates that the operating agreement contain "provisions not inconsistent with law . . . relating to (i) the business of the limited liability company, (ii) the conduct of its affairs and (iii) the rights, powers, preferences, limitations or

responsibilities of its members [and] managers." Where an operating agreement, such as that of 1545 LLC, does not address certain topics, a limited liability company is bound by the default requirements set forth in the Limited Liability Company Law (see *Matter of Spires v Lighthouse Solutions, LLC*, 4 Misc 3d at 436-437; 1545 LLC operating agreement art 7.4).

The operating agreement of 1545 LLC does not contain any specific provisions relating to dissolution. It provides only in article 1.5 that "[t]he Company's term is perpetual from the date of filing of the Articles of Organization . . . unless the Company is dissolved."

Crown Royal argues for dissolution based on the parties' failure to hold regular meetings, failure to achieve quorums, and deadlock. The operating agreement, however, does not require regular meetings or quorums (see 1545 LLC operating agreement arts 4.2, 4.13). It only provides, in article 4.12, for meetings to be held at such times as the managers may "from time to time determine." The record demonstrates that the managers, King and Van Houten, communicated with each other on a regular basis without the formality of a noticed meeting which appears to conform with the spirit and letter of the operating agreement and the continued ability of 1545 LLC to function in that context.

King and Van Houten did not always agree as to the construction work to be performed on the 1545 LLC property. King claims that this forced the parties into a "deadlock." "Deadlock" is a basis, in and of itself, for judicial dissolution under Business Corporation Law § 1104. However, no such independent ground for dissolution is available under Limited Liability Company Law § 702. Instead, the court must consider the managers' disagreement in light of the operating agreement and the continued ability of 1545 LLC to function in that context.

It has been suggested that judicial dissolution is only available when the petitioning member can show that the limited liability company is unable to function as intended or that it is failing financially (see *Schindler v Niche Media Holdings*, 1 Misc 3d 713, 716 [2003]). Neither circumstance is demonstrated by the petitioner here. On the contrary, the purpose of 1545 LLC was feasibly and reasonably being met.

The "not reasonably practicable" standard for dissolution of limited liability companies and partnerships has been examined in other jurisdictions. In Delaware, the Chancery Court has observed, "Given its extreme nature, judicial dissolution is a

limited remedy that this court grants sparingly" (*Matter of Arrow Inv. Advisors, LLC*, 2009 WL 1101682, \*2, 2009 Del Ch LEXIS 66, \*8 [2009]). In Virginia, dissolution is only available when the business cannot continue "in accord with its . . . operating agreement" (*Dunbar Group, LLC v Tignor*, 267 Va 361, 367, 593 SE2d 216, 219 [2004] [serious differences of opinion among the members and the managers and the comingling of funds was insufficient to warrant a finding that it was not reasonably practicable for the company to continue]). However, where the economic purpose of the limited liability company is not met, dissolution is appropriate (*see Kirksey v Grohmann*, 754 NW2d 825 [SD 2008]). Several courts take the view that the "not reasonably practicable" standard should be read as "capable of being done logically and in a reasonable, feasible manner" (*Taki v Hami*, 2001 WL 672399, \*3, 2001 Mich App LEXIS 777, \*8 [2001] [dissolution granted where the two partners had not spoken in years and there were allegations of violence and expulsion]), or as "one of reasonable practicability, not impossibility" (*PC Tower Ctr., Inc. v Tower Ctr. Dev. Assoc. L.P.*, 1989 WL 63901, \*6, 1989 Del Ch LEXIS 72, \*16 [1989]).

Here, a single manager's unilateral action in furtherance of the business of 1545 LLC is specifically contemplated and permitted. Article 4.1 of the 1545 LLC operating agreement states: "At any time when there is more than one Manager, *any one manager may take any action permitted under the Agreement,* unless the approval of more than one of the Managers is expressly required pursuant to the Agreement or the Act" (emphasis added). This provision does not require that the managers conduct the business of 1545 LLC by majority vote. It empowers each manager to act autonomously and to unilaterally bind the entity in furtherance of the business of the entity. The 1545 LLC operating agreement, however, is silent as to the issue of manager conflicts. Thus, the only basis for dissolution can be if 1545 LLC cannot effectively operate under the operating agreement to meet and achieve the purpose for which it was created. In this case, that is the development of the property which purpose, despite the disagreements between the managing members, was being met. As the Delaware Chancery Court noted in *Matter of Arrow Inv. Advisors, LLC*,

> "The court will not dissolve an LLC merely because the LLC has not experienced a smooth glide to profitability or because events have not turned out exactly as the LLC's owners originally envisioned;

such events are, of course, common in the risk-laden process of birthing new entities in the hope that they will become mature, profitable ventures. In part because a hair-trigger dissolution standard would ignore this market reality and thwart the expectations of reasonable investors that entities will not be judicially terminated simply because of some market turbulence, dissolution is reserved for situations in which the LLC's management has become so dysfunctional or its business purpose so thwarted that it is no longer practicable to operate the business, such as in the case of a voting deadlock or where the defined purpose of the entity has become impossible to fulfill . . .

"Dissolution of an entity chartered for a broad business purpose remains possible upon a strong showing that a confluence of situationally specific adverse financial, market, product, managerial, or corporate governance circumstances make it nihilistic for the entity to continue" (2009 WL 1101682, *2-3, 2009 Del Ch LEXIS 66, *9-14 [2009]).

Here, the operating agreement avoids the possibility of "deadlock" by permitting each managing member to operate unilaterally in furtherance of 1545 LLC's purpose.

## V

After careful examination of the various factors considered in applying the "not reasonably practicable" standard, we hold that for dissolution of a limited liability company pursuant to Limited Liability Company Law § 702, the petitioning member must establish, in the context of the terms of the operating agreement or articles of incorporation, that (1) the management of the entity is unable or unwilling to reasonably permit or promote the stated purpose of the entity to be realized or achieved, or (2) continuing the entity is financially unfeasible.

## VI

■ Dissolution is a drastic remedy (see Matter of Arrow Inv. Advisors, LLC, 2009 WL 1101682, *2, 2009 Del Ch LEXIS 66, *9 [2009]). Although the petitioner has failed to meet the standard for dissolution enunciated here, there are numerous other factors which support the conclusion that dissolution of 1545 LLC is inappropriate under the circumstances of this case.

First, the dispute between King and Van Houten was not shown to be inimicable to achieving the purpose of 1545 LLC (*see e.g. Haley v Talcott,* 864 A2d 86, 94 [Del Ch 2004] [Delaware's "not reasonably practicable" standard "has the obvious purpose of providing an avenue of relief when an LLC cannot continue to function in accordance with its chartering agreement"]). Indeed, the test is "whether it is 'reasonably practicable' to carry on the business of the [LLC], and not whether it is 'impossible' " (*Fisk Ventures, LLC v Segal,* 2009 WL 73957, *3, 2009 Del Ch LEXIS 7, *9-10 [2009], *affd* 984 A2d 124 [Del Super Ct 2009]).

King never objected to the quality of Van Houten's construction work, but only to its expense. The work on building A was all but complete when this proceeding was commenced. King approved and praised it. Further, the parties were operating in conformity with the operating agreement.

Second, there is a remedy available in the Limited Liability Company Law to regulate Van Houten's conduct. Limited Liability Company Law § 411 permits a limited liability company to avoid contracts entered into between it and an interested manager, or another limited liability company in which a manager has a substantial financial interest, unless the manager can prove the contract was fair and reasonable. Crown Royal took no action under Limited Liability Company Law § 411 here. Beyond complaining about the cost of VHC's work and seeking to withdraw from 1545 LLC, the record is clear that Crown Royal ratified, albeit grudgingly at times, Van Houten's unilateral efforts.

The notion that 1545 LLC could void the contract with VHC in its entirety may serve as a check on Van Houten's unilaterally hiring his own company for future construction work on the property, and may result in Van Houten being made to disgorge excess moneys paid in derogation of 1545 LLC's best interest at the time of the accounting of the members. In any event, a fair reading of Limited Liability Company Law § 702 demonstrates that an application to dissolve 1545 LLC does not flow from a claim under Limited Liability Company Law § 411.

Finally, if Crown Royal is truly aggrieved by Van Houten's actions as manager, the Court of Appeals has found that a derivative claim is available (*see Tzolis v Wolff,* 10 NY3d 100 [2008]). Nevertheless, such remedy cannot serve as the basis for dissolution unless the wrongful acts of a managing member which give rise to the derivative claim are contrary to the contemplated functioning and purpose of the limited liability company.

## VII

"The appropriateness of an order for dissolution of [the] limited liability company is vested in the sound discretion of the court hearing the petition" (*Matter of Extreme Wireless*, 299 AD2d 549, 550 [2002], citing Limited Liability Company Law § 702). However, in applying the standard for dissolution of a limited liability company, upon a review of the evidence submitted, we conclude that the Supreme Court did not providently exercise its discretion in granting the petition for dissolution. Thus, the order of the Supreme Court should be reversed, the petition denied, and the proceeding dismissed.

FISHER, J.P. (concurring in part and dissenting in part). A limited liability company may be judicially dissolved when the court, in the exercise of its discretion, finds that it is no longer reasonably practicable for the company to carry on its business in conformity with its articles of organization or operating agreement (*see Matter of Extreme Wireless*, 299 AD2d at 550; Limited Liability Company Law § 702). I have no serious quarrel with the standard the majority adopts based on its analysis of the authorities it cites. In my view, those authorities and the plain language of the statute suggest that, pursuant to Limited Liability Company Law § 702, it is "not reasonably practicable" for a limited liability company to carry on its business in conformity with its articles of organization or operating agreement when disagreement or conflict among the members regarding the means, methods, or finances of the company's operations is so fundamental and intractable as to make it unfeasible for the company to carry on its business as originally intended.

Here, 1545 Ocean Avenue, LLC (hereinafter 1545 LLC), was formed to purchase a certain piece of property, to rehabilitate a building that stood on it, and to build a second building on the property for commercial rental. The majority recounts the growing disputes between the managers of 1545 LLC, John King and Walter Van Houten, which ultimately led to King's withdrawal from management of 1545 LLC, amid claims, inter alia, that Van Houten had turned the project "into a construction job for [his] own company," that he did work at excessive cost without King's consent, that he violated the parties' agreement that all construction work was to be procured through a competitive bidding process, that he submitted invoices billing 1545 LLC on a time-and-materials basis which King believed was unacceptable for a commercial project, and that Van Houten had refused

to fulfill his responsibility to pay real estate taxes and vendors. Many of those allegations were disputed by Van Houten, but the Supreme Court made no findings of fact.

In my view, without a factual finding, we cannot meaningfully decide whether the Supreme Court providently exercised its discretion in finding that the actions of the parties rendered it not reasonably practicable for 1545 LLC to carry on its business in conformity with its articles of organization or operating agreement. Accordingly, I would remit the matter to the Supreme Court, Suffolk County, for a fact-finding hearing and thereafter for a new determination on the petition (*cf.* Business Corporation Law § 1109; *Sobol v Les Pieds Nickels*, 262 AD2d 194, 196 [1999]; *Matter of Giordano v Stark*, 229 AD2d 493, 494-495 [1996]).

DILLON and MILLER, JJ., concur with AUSTIN, J.; FISHER, J.P., concurs in part and dissents in part in a separate opinion in which CHAMBERS, J., concurs.

Ordered that the order is reversed, on the facts and in the exercise of discretion, with costs, the petition is denied, and the proceeding is dismissed.